IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| OANDREA L. HAYES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 2:14-cv-04215-NKL |
| ) | |
| CAROLYN W. COLVIN, ) | |
| Acting Commissioner ) | |
| of Social Security, ) | |
| ) | |
| Defendant. ) | |

**ORDER**

Plaintiff Oandrea Hayes seeks review of the Administrative Law Judge's (ALJ) decision denying her applications for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401, et seq., §§ 1381, et seq. [Doc. 20]. For the reasons set forth below, the decision of the Administrative Law Judge (ALJ) is affirmed.

**I. Background**

   **A. Procedural Background**

Hayes filed her applications for disability benefits in September 2006. After a hearing in March 2009, an ALJ concluded that Hayes was not disabled as defined by the Social Security Administration. After the Appeals Council affirmed the ALJ's decision, Hayes appealed the decision to this Court in May 2011. In February 2012, this Court remanded the case for further consideration after concluding that the ALJ made no explicit findings as to Hayes' functional limitations, failed to address whether Hayes had any visual or environmental limitations, and failed to evaluate Hayes' functional loss due to her mental impairments as required by 20 C.F.R.

1

§ 404.1520a(c)(3). *See Hayes v. Colvin*, No. 2:11-cv-04132-NKL (W.D. Mo. filed Feb. 2, 2012). A second hearing with a new ALJ was held in October 2012, and in January 2013, the ALJ concluded that Plaintiff was not disabled because Hayes could perform work that existed in significant numbers in the national economy. [Tr. 811]. The Appeals Council affirmed and Hayes appealed the final decision to this Court. Hayes alleges the Commissioner's decision should be revered for three reasons.[1] First, Hayes argues the ALJ's determination that her vision loss is non-severe is not supported by substantial evidence. Second, Hayes contends the ALJ improperly relied on the vocational expert's (VE) testimony because the job of "power screwdriver operator" is inconsistent with Hayes' RFC. And third, Hayes argues the ALJ's conclusion that she could perform work as a "photo copy machine operator" is not supported by substantial evidence because the VE testified that she could not perform that job due to her seizure disorder.

**B. Medical History**

Hayes has a significant history of medical conditions including sarcoidosis, asthma secondary to sarcoidosis, headaches, seizures and pseudo-seizures, post-traumatic stress disorder, depression, sarcoidosis-related vision loss, joint and back pain, and hypertension. However, because Hayes only contests the ALJ's analysis of her vision loss, the medical history below is limited to that impairment.[2]

Hayes vision loss is primarily restricted to her left eye. In all but one examination, Hayes' right eye vision was 20/20. In November 2005, Hayes complained of decreased vision.

---

[1] In the Conclusion of her initial brief, Hayes also states that she has "clearly severe psychiatric problems, as confirmed by the treating psychiatrist of several years; has sarcoidosis which is known to cause serious damage to the lungs and the eyes, both of which are endured by the Plaintiff, and the Plaintiff has a seizure which is caused by epilepsy, PTSD, or both." [Doc. 20, p. 67]. But Hayes does not explain why the presence of these impairments alone requires reversal of the Commissioner's decision. In other words, Hayes does not challenge any part of the ALJ's analysis related to these impairments.

[2] For a thorough review of Hayes' medical history, see Hayes' initial brief, [Doc. 20, pp. 3-45]

Upon examination, her left eye vision was 20/600. [Tr. 455]. In May 2006, Hayes' left eye vision was 20/20 and examination of the eye was largely normal. [Tr. 246]. In November 2006, Hayes' left eye vision was 20/400. [Tr. 459]. There were "diffuse nonspecific changes throughout the left visual field," decreased color vision, mild afferent pupillary defects, mild optic nerve pallor, and significant "candle wax" drippings or vitreous "snowballs" consistent with a vitritis or overt intraocular inflammation. *Id.* at 459-60. All other aspects of her eye were within the normal limits. In December 2006, Hayes' vision was 1/200 in the left eye, and she experienced a "further decline in vision." [Tr. 422]. There was a "3-quadrant visual field defect in the left eye." [Tr. 422]. Hayes described this vision loss as only having one small area of vision. [Tr. 466]. In January 2007, Hayes' vision improved to 20/50 in the left eye suggesting "some improvement in visual function." [Tr. 465]. In March 2007, Hayes' left eye vision was 20/30. [Tr. 463]. Hayes complained of "significant side effects" from the medication being used to improve her vision, and the ophthalmologist agreed to reduce the dose. In April 2007, Hayes' left eye vision was 20/30. [Tr. 466]. In June 2007, she had 20/40 vision in her left eye. [Tr. 470]. In November 2007, Hayes' left eye vision declined to 20/400. [Tr. 469]. The ophthalmologist opined that Hayes had "decrease in vision in the left eye that is quite variable suggesting possible nonorganic vision loss . . . from neurosarcoidosis." [Tr. 472]. In December 2007, Hayes' left eye vision improved to 20/40. [Tr. 476]. In February 2010, Hayes had 20/30 vision in her left eye and reported no significant change in visual function. [Tr. 1370]. The ophthalmologist stated that Hayes has left eye visual loss secondary to infiltrative optic neuropathy in relationship to neurosarcoidosis, that the vision loss "remained stable to possible improvement," and that there was no evidence of active sarcoidosis involving the eyes. [Tr. 1370-71]. Hayes was asked to return in two to three years. [Tr. 1371]. In April 2012, Hayes'

right eye vision was 20/25 and left eye vision was 20/30. [Tr. 1472]. The ophthalmologist stated that Hayes had stable visual loss and left eye optic atrophy. There was evidence of thinning of the nerves in both eyes, but no change since 2007 and 2009 examinations. Hayes was asked to return in one year. *Id.* At her hearing in October 2012, Hayes testified that she experienced no changes in her vision during the last six years. [Tr. 1739]. She stated she could only see "just basically a little circle in my left eye." *Id.*

### C. ALJ's Decision and VE's Testimony

After the second hearing, the ALJ concluded that Hayes had the following severe impairments: sarcoidosis with asthma, headaches, seizures with pseudo-seizures, post-traumatic stress disorder, and depression. [Tr. 796]. The ALJ determined that Hayes' vision loss, knee and back pain, and hypertension were non-severe. The ALJ concluded that Hayes had the residual functional capacity (RFC) to perform light work. She could lift twenty pounds occasionally and ten pounds frequently. She could stand, walk, or sit six hours in an eight hour day. She cannot climb ladders, ropes, or scaffolds, should avoid all exposure to temperature extremes and pulmonary irritants, and should avoid hazards such as unprotected heights and being around dangerous moving machinery or the operation of motorized vehicles. She can understand, remember, and carry out simple instructions consistent with unskilled work and can tolerate only minor, infrequent changes within the workplace. She can tolerate occasional contact with co-workers and supervisors but not contact with the general public. [Tr. 800].

In support of her finding that Hayes' vision loss was non-severe, the ALJ stated that the longitudinal treatment records showed that Hayes' vision significantly improved and was currently stable. [Tr. 797]. The ALJ also concluded that Hayes' activities of daily living were

inconsistent with a finding that her vision loss caused more than a minimal vocationally relevant limitation. *Id.*

At the October 2012 hearing, the ALJ enlisted the expertise of a VE. The VE testified that Hayes could not perform past work. [Tr. 1756]. The VE then provided several other jobs he believed Hayes could perform such as a housekeeper/cleaner, laundry worker, power screwdriver operator, and photo copy machine operator. [Tr. 1758-59]. The housekeeper/cleaner and laundry worker jobs were rejected by the ALJ due to limitations within Hayes' RFC. Relying on the VE's testimony, the ALJ concluded that Hayes was not disabled because she could perform work as a power screwdriver operator and as a photo copy machine operator.

## II. Discussion

### A. Is the ALJ's conclusion that Hayes' vision loss is non-severe supported by substantial evidence in the record?

Hayes argues the ALJ's finding that her vision loss was non-severe is not supported by substantial evidence in the record. "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707-08 (8th Cir. 2007). While severity is not an onerous requirement, it is not toothless. *Id.* The claimant bears the burden of establishing that her impairment or combination of impairments is severe. *Id.*

The ALJ's conclusion that Hayes' vision loss was not severe is supported by substantial evidence in the record. While Hayes experienced significant left eye vision loss during November 2005, November 2006, and November 2007, all other examinations revealed relatively mild vision loss ranging from 20/30 to 20/50. Records after November 2007 repeatedly observe that Hayes' vision loss was stable or slightly improved. Treatment was also conservative. In February 2010, Hayes' ophthalmologist recommended Hayes return in two to

5

three years. [Tr. 1371]. In April 2012, she was asked to return in a year. [Tr. 1472]. The ophthalmologist also opined in February 2010 that there was no evidence of active sarcoidosis involving the eyes. [Tr. 1370-71]. Hayes argues the evidence merely demonstrates that her vision is not guaranteed to be stable. However, from December 2007 to the last medical record available in April 2012, Hayes' left eye vision was consistently 20/30 or 20/40 and her right eye vision was 20/20 or 20/25. This evidence supports the ALJ's conclusion that over time, Hayes' vision improved and stabilized.

In addition to relying on the medical records, the ALJ also observed that Hayes was able to read the Bible daily, read at the library, watch television, and use a computer on a regular basis – all activities inconsistent with severe vision loss. In another portion of the opinion, the ALJ also observed that Hayes was able to attend classes at a community college. Hayes argues that the record does not support the ALJ's conclusion that she is able to read frequently. First, Hayes points to her testimony related to reading the Bible. When the ALJ asked her if she still read her Bible daily, Hayes stated, "I got to or I'll - - yeah." [Tr. 1746]. The ALJ then asked, "How often? Is that daily? How often do you read the Bible?" Hayes responded, "Every day I wake up, rejoice my every day. . . . Every Sunday I do joy [inaudible] three times a day. Three times on Sunday. Rejoice [inaudible] maybe three times a day." *Id.* Hayes argues this testimony does not support the ALJ's conclusion that she reads her Bible daily, but while Hayes' answer is not unequivocal, Hayes never testified that she had difficulty reading her Bible. Hayes also testified that she used to go to the library a couple times per week for not more than an hour to read. [1747-48]. Hayes argues that the ALJ improperly relied on this testimony because she later testified that she had not been recently. However, Hayes stated she had not been to the library since she had a seizure; there is no indication from this testimony that Hayes did not go because

6

she could no longer see to read. [Tr. 1747]. Hayes also argues that the record does not support a finding that she used a computer on a "regular basis." Hayes did use a computer to complete homework assignments on occasion. While this may not have been frequent or "regular" use, Hayes never attributed the infrequency of her use to poor vision.

Hayes has the burden of demonstrating that her vision loss was severe. Other than pointing to various times when her vision loss was significant, Hayes points to no other evidence or opinion in the voluminous record that contradicts the ALJ's conclusions or demonstrates that she has a severe impairment. The ALJ's determination that Hayes' vision loss was non-severe is supported by substantial evidence in the record, and therefore, reversal is not appropriate.

**B. Is the job of power screwdriver operator precluded by Hayes' RFC?**

Next, Hayes argues the job of power screwdriver operator is precluded by Hayes' RFC which states she should avoid "being around dangerous moving machinery." However, the ALJ relied on the testimony of the VE who, knowing the "dangerous moving machinery" limitation applied, testified that Hayes could perform work as a power screwdriver operator. The VE stated that his testimony was consistent with the Dictionary of Occupational Titles (DOT) and "supplemented with my education, training, and experience." [Tr. 1759]. The Commissioner has the burden of showing that a claimant can perform other work. *Porch v. Chater*, 115 F.3d 567, 571 (8th Cir. 1997). "Ordinarily, the Commissioner can rely on the testimony of a vocational expert to satisfy this burden." *Id.* However, "when VE testimony conflicts with the DOT, the DOT controls if its classifications are unrebutted, and . . . in such circumstances, the VE's testimony does not constitute substantial evidence upon which the Commissioner may rely . . . ." *Kemp ex rel. Kemp b. Colvin*, 743 F.3d 630, 632 (8th Cir. 2014).

7

Hayes argues a power screwdriver is "dangerous moving machinery." However, the DOT does not state that a power screwdriver is "dangerous" and so the VE's testimony is not inconsistent with the DOT. The DOT job description for a power screwdriver operator states that a person performing this job:

> Tends power screwdriver that tightens bolts, nuts, or drives screws to assemble products fabricated from materials, such as wood, metal, plastic, or other materials: Threads or clamps specified torque chuck onto machine spindle. Inserts shank of specified wrench or screwdriver bit into chuck and tightens it, using chuck wrench. Inserts screw or bolt through holes of workpieces or nut onto stud, and turns screw or bolt to catch thread. Positions bolt or nut under bit, and depresses lever to lower spindle and grip head of screw or nut. Pushes pedal to activate spindle that turns and tightens nut, bolt, or screw to torque limit of chuck. May tend machine that positions screw or bolt into workpiece. May tend machine that is activated by pressing workpiece against chuck. May fill hoppers with screws and tend machine that automatically feeds screw between aligned holes of workpiece.

POWER-SCREWDRIVER OPERATOR, DICOT 699.685-026. The description also states that there are occasional moving parts existing up to one-third of the time. *Id.* While it is possible a power screwdriver could be "dangerous moving machinery" the Court cannot substitute its own opinion for the expertise of the VE and the ALJ's reliance on that expertise when it is not inconsistent with the DOT.

Hayes cites to two sources in support of her argument that a power screwdriver is "dangerous moving machinery." The first source is a website entitled "Technology Student." The website states that a power "screwdriver blade is dangerous." *See* "Power Screwdrivers," at http://www.technologystudent.com/pwtol/scdrv1.htm. However, this website is not verifiable and is not part of the DOT or, to this Court's knowledge, any publication by the Social Security Administration. Hayes also cites to an Occupational Safety and Health Administration regulation "regarding the power screwdriver," 29 C.F.R. 1910, Subpart P. But Hayes does not

identify what portion of Subpart P relates to the power screwdriver. Upon independent review of Subpart P, this Court could find nothing related to the power screwdriver. The Subpart does describe a "fastener driver" but merely explains that powered drills and fastener drivers must be equipped with a "constant pressure switch or control, and may have a lock-on control provided that turnoff can be accomplished by a single motion of the same finger or fingers that turn it on." 29 C.F.R. § 1910.243. This evidence does not support Hayes' claim that the power screwdriver is "dangerous moving machinery."

Hayes also points out that the description of a power screwdriver operator requires frequent near acuity, but as discussed above, the ALJ's conclusion that Hayes' vision was non-severe is supported by substantial evidence in the record. Hayes does not state how the ALJ's RFC should have accommodated her vision loss and points to no medical opinion limiting her ability to work because of vision. Therefore, this argument is unpersuasive.

The VE's testimony is not inconsistent with the DOT, and accordingly, the ALJ was entitled to rely on the VE's testimony to satisfy the Commissioner's burden of proving Hayes could perform other work. Because the ALJ's conclusion that Hayes could perform other work and is therefore not disabled is supported by substantial evidence in the record, reversal of the Commissioner's decision is not appropriate.

**C. Is the ALJ's conclusion that Hayes can perform work as a copy machine operator supported by substantial evidence in the record?**

Hayes also argues that the ALJ's determination that she could perform work as a copy machine operator is not supported by substantial evidence in the record. Hayes argues that the ALJ's conclusion is directly contradicted by the VE's testimony. It is true that while the VE originally testified that Hayes could perform work as a copy machine operator, the VE later stated that due to Hayes' seizure disorder, that job was not available because of the light on the

9

machine. Directly after mentioning copy machine operator as an available job, the VE stated, "Oh no. That would – the seizure precaution, because of the light on it." [Tr. 1764]. But while the ALJ's conclusion as to this job is not supported by substantial evidence in the record, the error in making that conclusion is harmless because the ALJ also concluded that Hayes could perform work as a power screwdriver operator – a job with 1,300 positions in Missouri and 80,800 positions nationwide. [Tr. 810]; *see also Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997) (200 jobs in the state and 10,000 in the national economy was a significant number of jobs in the economy); *Lee v. Sullivan*, 988 F.3d 789, 794 (7th Cir. 1993) (1,400 positions and collecting cases from the Eighth, Ninth, Tenth, and Eleventh Circuits finding that 1,350 positions, 1,266 positions, 850-1,000 positions, 500 positions, 174 positions, and 675 positions were significant numbers). As discussed above, that conclusion is supported by substantial evidence in the record. Therefore, reversal is not necessary based on this harmless error. *See Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014) ("Finally, the ALJ did not err in relying on the [VE]'s testimony. Although the [VE] recommended the job of flat work finisher despite [the claimant's] inability to perform such work, one mistaken recommendation does not devalue the rest of her opinion. An ALJ may rely on a [VE]'s testimony as long as some of the identified jobs satisfy the claimant's residual functional capacity.") (internal citations omitted).

### III. Conclusion

For the reasons set forth above, the Commissioner's decision is supported by substantial evidence in the record, and is therefore, affirmed.

                                              s/ Nanette K. Laughrey
                                              NANETTE K. LAUGHREY
                                              United States District Judge

Dated: June 23, 2015
Jefferson City, Missouri